## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE-OPELOUSAS DIVISION

Kling Realty Co., Inc., et al.                    Civil Action No. 06-1492

versus                                            Judge Tucker L. Melançon

Texaco, Inc. et al.                               Magistrate Judge Methvin


### MEMORANDUM RULING

Before the Court is defendant Chevron U.S.A.'s ("Chevron") Motion for Partial Summary Judgment [Rec. Doc. 24]; plaintiffs Kling Realty Company, Inc. and Walet Planting Company's (collectively referred to as "Kling Realty") opposition thereto [Rec. Doc. 26]; Chevron's Supplemental Memorandum in Support of Motion for Partial Summary Judgment [Rec. Doc. 32]; and Chevron's Second Supplemental Memorandum in Support of Motion for Partial Summary Judgment [Rec. Doc. 44]. Also before the Court are Chevron's Motions to Strike Affidavit of Herman Walet and William D. Griffin [Rec. Docs. 28, 29]; Kling Realty's Memorandum in Opposition to Chevron's Motion to Strike and Partial Summary Judgment [Rec. Doc. 34] and Chevron's Supplemental Memorandum in Support of Motions to Strike Affidavits of Herman Walet and William Griffin [Rec. Doc. 37]. For the reasons that follow Chevron's Motion will be denied in part and deferred in part.

*I. Background*

On June 30, 2006, plaintiffs filed a Petition for Damages in the Sixteenth Judicial District Court for the Parish of Iberia, State of Louisiana, and on August 30, 2006 the action was removed to this Court [Petition, Rec. Doc. 1]. Plaintiffs sought compensatory and punitive damages from Chevron and other named defendants, including Texaco, Inc., Texaco Exploration and Production, Inc., Estis Well Service, LLC and Jack P. Martin, Sr. [Id.].[1]  Plaintiffs allege that they are the lessors, assigns and/or successors in interest to certain Oil, Gas and Mineral Leases between plaintiffs and defendants and that they own certain real property located in Iberia Parish, Sections 21 and 22, Township 11 South, Range 8 East [Id. paras. 1, 4, ]. Chevron indicates that this property is known as the Fausse Point Field [Chevron's Memorandum in Support of Motion for Partial Summary Judgment, Rec. Doc. 24, p. 1].  Plaintiffs allege further that Chevron, in addition to the other named defendants, "conducted, directed, controlled or participated in various oil and gas exploration and production activities as operators and/or working interest owners, and/or joint venturers in the Fausse Point Field," and that the property has been contaminated or otherwise damaged by defendants' oil and gas exploration and production activities [Id. paras. 1, 7].

---

[1]    Plaintiffs' claims against Estis Well Service, LLC and Jack P. Martin, Sr. were dismissed on January 8, 2007 [Rec. Doc. 19].

Plaintiffs allege still further that, since at least the 1930's, defendants have known that the disposal of oilfield wastes in unlined earthen pits or directly to waterways inevitably results in seepage, which contaminates both surface and subsurface soils and waters [Id. par. 9].  Plaintiffs also allege that the oilfield wastes deposited in these pits and water bodies include substances such as naturally occurring radioactive material ("NORM"), produced water, drilling fluids, chlorides, hydrocarbons, and heavy metals and that leaks, spills, and other discharges of these substances from wells, pipelines, tank batteries, gas plants [Id.].  Lastly, Plaintiffs allege:

> [d]efendants knew or should have known that their day to day operations in the Fausse Point Field would cause the soil, surface waters, and ground waters of Plaintiff's property to erode and to be contaminated with the substances described . . . Rather than repairing that erosion or removing these substances during or after oil and gas exploration and production activities, defendants chose to ignore this erosion and to conceal and cover up this contamination.  This concealment and cover up was routine practice.  The defendant's failure to timely remove or remediate this toxic pollution in the soils and ground waters of Plaintiff's property has allowed the pollution to migrate and spread.

[Id., par. 14].

Chevron raised, among other defenses, affirmative defenses of waiver and/or release and of accord and satisfaction to plaintiffs' claims, arguing that plaintiffs and/or their predecessors in interest relinquished all rights and legal claims for damages arising from Chevron's operation of No. 6 Kling-Walet well, ("Well No. 6"

3

or "No. 6 Kling-Walet well"), pits, tanks installation and other equipment association

with Well No. 6, and raised a defense of no cause of action.[2]   In regards to No. 6

Kling-Walet well, plaintiffs and/or their predecessor in interest entered into a Release

Agreement with Texaco Inc., Chevron's predecessor in interest, dated September 12,

1973, ("the Release"), the pertinent parts of which follow:

> [Plaintiffs] have released and forever discharged, and by these presents do release and forever discharge said TEXACO Inc., its successors and assigns, and any and all persons employed by or connected with it, of and from all claim or claims, demand or demands, damages, actions, cause or causes of actions by reason of or arising out of drilling, producing and abandonment of Texaco No. 6 Kling-Walet well and the clean-up of the sites of tanks, pits and other installations in connection therewith, in the Southeast Quarter of Section 21, Township 11 South, Range 8 East, Iberia Parish, Louisiana.

> It is also understood and agreed that we, the undersigned, assume full responsibility for restoring the area disturbed by Texaco's operations to its former condition.

---

[2]   Chevron references its Answer and Affirmative Defenses [Rec. Doc. 11], specifically its Tenth Affirmative Defense, which states, "Plaintiffs and their predecessor(s) in title waived and/or released any claims they may have had against Chevron arising out of operations, if any, by Chevron's predecessors and/or Chevron on Plaintiffs' properties;" its Twenty-First Affirmative Defense, which states, "Plaintiffs and/or their predecessor(s) in title assumed the risk of the property damages alleged in the Petition;" its Twenty-Fifth Affirmative Defense, which states "Plaintiffs have no cause of action against Chevron;" and its Thirtieth Affirmative Defense, which states, "To the extent that Plaintiffs have received payment from Chevron and/or any of its predecessor(s) in title in full satisfaction of any of the alleged injuries and/or claims against them and/or other alleged joint tortfeasors, each and every count and cause of action alleged in Plaintiffs' Petition is barred by the defenses of payment and accord and satisfaction."

> It is recognized by the undersigned that the residue from a back-filled saltwater pit at the former tank battery site has reduced crop growth in a small area at the site, and the undersigned particularly agree that no further claims or demands will be made in connection therewith.

The Release indicates a consideration paid of $4,140.00.  Kling-Walet Well No. 6 is located on Section 21 of plaintiffs' property [Chevron's Statement of Uncontested Material Facts, Rec. Doc. 24, No. 3].  Based on plaintiffs' admission, Chevron indicated in its Motion for Partial Summary Judgment that no wells exist or have existed on Section 22 of plaintiffs' property [Id. No. 5].  However, in its Second Supplemental Memorandum, Chevron indicates, that, since the filing of its motion for partial summary judgment and supplemental memorandum, it has learned that plaintiffs' admission that no wells have been drilled on their property in Section 22 was inaccurate, noting that a recent search of Louisiana Department of Natural Resources records revealed that Humble Oil Company operated a well on Section 22 of plaintiffs' property [Chevron's Second Supplemental Memorandum, Rec. Doc. 44, including Affidavit of Darlene Tiger-Turpin, Exhibit A].

Plaintiffs have submitted the affidavit of Herman Walet,  ("Walet affidavit"), President of Walet Brothers, Inc. at the time the compromise was confected between

Walet Brothers, Inc. and Kling Realty Company with Texaco, Inc. [See Rec. Doc. 28, Exhibit A].  In his affidavit, Walet avers that the Texaco Kling-Walet Well No. 6 was plugged and operations at that site abandoned on or about October, 1971 and that at no time prior and up to signing of the compromise agreement on September 12, 1973 did Texaco Inc. inform Walet Brothers, Inc. and Kling Realty Company about the destructive nature of their operations in depositing toxic and hazardous waste into and/or onto the property located in Section 21, Township 11 South, Range 8 East [Id. at 4-5].  Walet further declares that Texaco specifically represented that it would take a maximum of three years for the small area of property where oil equipment was located and having reduced crop growth to be completely returned back to normal for planting and harvesting of sugarcane [Id. at 5]. Walet declares that Texaco's operation of Well No. 6 has caused severe contamination to the property that Texaco Inc.'s equipment was situated upon and the contamination continues to spread throughout the surrounding property and that Kling Realty and Walet Brothers, Inc. were never informed by Texaco of contaminants being dumped into the property [Id. at 7-8].  Walet avers that the compromise at issue did not involve the permanent contamination of any property related to Texaco's operation of Well No. 6 nor was there ever any mention of property contamination by Texaco Inc. discussed amongst Walet Brothers, Inc. and Kling Realty Co. prior to signing the release agreement [Id.

6

at 9]. Walet affirms that the Release entailed Texaco Inc. removing their equipment, placing and burying discarded debris and piping into a pit, and leaving the property's top-surface in disarray for Walet Brothers, Inc. and Kling Realty Company to level and prepare for future sugar cane production [Id. at 10].

Plaintiffs have also submitted the affidavit of Louisiana petroleum engineer William D. Griffin who was not a party to the Release but has been hired by plaintiffs as an expert consultant in the area of oil and gas exploration and production operations [Griffin Affidavit, Rec. Doc. 29, p 2]. Having reviewed the Release, plaintiffs' petition, Chevron's Motion for Partial Summary Judgment, Louisiana Office of Conservation records relating to oil and gas wells drilled in Sections 21 and 22 of plaintiffs' property, leases taken in Section 21, and having inspected the property, Griffin opines that the soil in Section 21 has been adversely impacted "well beyond what the release described as 'the sites of tanks, pits, and other installations in connection'" with Well No. 6 and that there is evident damage beyond the immediate sites of the tanks, pits, and other installations connected to the well [Id. at 8].

Griffin states that in his experience "releases such as this are intended to cover the plugging and abandonment of a well and the removal of equipment . . not property damage that extends beyond the immediate vicinity of the well" [Id.]. Griffin states

7

that soil contaminated by oil and gas field activities is often the tip of the proverbial "iceberg," *viz* , the greatest amount of damage lies below the surface [Id. at 9]. Griffin observes that the Release was executed almost two years after the Well No. 6 had been plugged and abandoned and opines that, in his experience, when earthen pits are back filled for abandonment, sometimes the pits are used as trash dumps and that a surface owner executing a release, particularly two years after a site was abandoned, would likely only have knowledge of the condition of the property visible at the surface and that he would not know of any possible "gasoline dispensing tanks" or other potentially hazardous material buried on his property [Id. at 13].

Griffin is also of the opinion that, "Texaco represented in the release that the only footprint remaining after the earth was abandoned was 'residue from a back-filled salt water pit' . . . If something other than 'residue' was left in the pit at abandonment, Texaco would have superior knowledge of its existence and would have taken unfair advantage of the surface owners' lack of knowledge" [Id. at 14].

Chevron moves for a partial summary judgment dismissing plaintiffs' claims arising from Chevron's operation of Well No. 6 on the basis that plaintiffs' have compromised these claims for damages, and dismissing plaintiffs' claims relating to Section 22 of their property as it has conducted no drilling operations on Section 22. In its Supplemental Memorandum in Support of Motion for Summary Judgment,

Chevron alternatively argues that plaintiffs' claims for damages related to Well No.

6 have prescribed.  Chevron also moves to strike plaintiffs' submissions of the Griffin

and Walet affidavits.

*II. Summary Judgment Standard*

Summary judgment is proper when the pleadings and evidence on file show

that no genuine issue exists as to any material fact and that the moving party is

entitled to judgment as a matter of law.  Fed.R.Civ. P. 56(c). The movant must inform

the court of the basis of its motion and identify the portions of the record which reveal

there are no genuine material fact issues. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986).  "In adjudicating a motion for summary judgment, the court must view

all facts in the light most favorable to the non-movant." *Adams v. Travelers Indem.*

*Co. of Conn.*, 2006 WL 2620585, 3 (5th Cir. 2006).   The function of the court,

therefore, is to make the threshold inquiry of determining whether there is a need for

a trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Once the movant

makes this showing, the nonmovant must demonstrate that there is evidence in the

record establishing that there is a genuine issue of material fact for trial. *Celotex* at

323-24. To carry this burden, the opponent must do more than simply show some

metaphysical doubt as to the material facts.  *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986).  A dispute as to a material fact is "genuine"

9

under Rule 56(c) only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 251-52.  The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to preclude a grant of summary judgment.  *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir.1999). The opponent must present evidence sufficient to support a resolution of the factual issue in his favor.  *Anderson*, 477 U.S. at 248-52. The court may properly enter summary judgment against a party if that party fails to establish the existence of an element essential to the case and as to which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-24.  Summary judgment is also appropriate when the only issues to be decided in the case are issues of law, or when the non-moving party's claims are legally deficient. *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063, 1065 (5th Cir.1995).  When the facts are disputed, the court does not determine the credibility of the evidence and draws all justifiable inferences in favor of the nonmovant.  *Bledsoe v. City of Horn Lake, MS* , 449 F.3d. 650, 652-53 (5th Cir.2006).

### III.  The Release and the Admissiblity of the Griffin and Walet Affidavits

#### 1.  Law

As evidenced by the Release Agreement, the parties have entered into a transaction or compromise.  Chevron has interposed the September 12, 1973 Release,

the essence of which is res judicata, as an affirmative defense to plaintiffs' petition.[3]

"The preclusive effect of a compromise may be raised by motion for summary judgment." *Dumas v. Angus Chemical Co.*, 742 So.2d  655, 661 (La. App. 2 Cir.1999), *citing   R.G. Claitor's Realty v. Juban*, 391 So.2d 394 (La. 1980) (on rehearing).  At issue is whether, pursuant to the Release, plaintiffs agreed to release all their claims relating to Well No. 6 and connected clean-up, including plaintiffs' claims of permanent contamination to their property, extending beyond the area referenced in the agreement as the "small area" at the "former tank battery site" having " reduced crop growth." Also at issue is the admissibility Walet and Griffin affidavits.

The Louisiana codal articles governing transaction and compromise are set forth in LSA-C.C. Arts. 3071 through 3083. *Brown v. Drillers*, *Inc.*, 630 So.2d 741, 747 (La. 1994).  A compromise is defined as "an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing." *Id. citing* LSA-C.C.

---

[3]    *See Copeland v. Wasserstein, Perella & Co., Inc.*,  278 F.3d 472, 480-481 (5th Cir. 2002).

Art. 3071.[4] "LSA-C.C. Art. 3078 declares the effect of a compromise, providing that a compromise has the legal efficacy of a judgment, possessing 'a force equal to the authority of things adjudged,' and that a compromise 'can not be attacked on account of any error in law or any lesion.'" *Id.* (citations omitted).[5]

A compromise is a written contract, is the law between the parties and must be interpreted according to the parties' true intent.  *Brown*, 630 So.2d at 748. A compromise agreement is governed by the same general rules of construction applicable to contracts.  *Id.*   When the words of a contract are clear and explicit and lead to no absurd consequences, no *further* interpretation may be made in search of the parties intent.  *Id.*, citing La. Civ. Code Art. 2046.  However, the determination

---

[4]    La. Civ. Code Art. 3071 was amended in the June, 2007 legislative session to read as follows:

> A compromise is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship.

LA LEGIS 138 (2007).  The legislative comments indicate the revision is not intended to change the law.

[5]    La. Civ. Code Art. 3080 was enacted in the June, 2007 legislative session as follows, "A compromise precludes the parties from bringing a subsequent action based upon the matter that was compromised."  LA LEGIS 138 (2007).  The 2007 revision comments indicated that the "preclusive effect of this Article is tantamount to that of former Article 3078 of the Louisiana Civil Code of 1870, prior to the revision of the law of res judicata in 1990," referencing R.S. 13:4231. LA LEGIS 138 (2007).

that the language contained in a contract is clear and explicit involves an interpretative process.  *Id.*

La. Civ. Code Art. 3073 provides a supplementary rule of construction governing the interpretation of a settlement agreement, providing that a compromise agreement extends only to those matters that the parties expressly intended to settle and that the scope of which cannot be extended by implication.  *Id.*[6]  In *Copeland v. Wasserstein, Perella & Co., Inc.*, the United States Court of Appeals for the Fifth Circuit considered the effects of the parties' settlement agreement, reviewing the district court's grant of summary judgment partially grounded in release, and noting:

> We must construe this settlement agreement-a "transaction" in the lexicon of the Louisiana Civil Code-under article 3073:
>
> > Transactions regulate only the differences which appear clearly to be comprehended in them by the intention of the parties, whether it be explained in a general or particular manner, unless it be the necessary consequence of what is expressed; and they do not extend to differences which the parties never intended to include in them.
> >
> > The renunciation, which is made therein to all rights, claims and pretensions, extends only to what relates to the differences on which the transaction arises.

---

[6]   La. Civ. Code Art. 3076 was enacted to reproduce the substance of La. Civ. Code Art. 3073 as follows, "A compromise settles only those differences that the parties clearly intended to settle, including the necessary consequences of what they express."  LA LEGIS 138 (2007).  The revisions comments indicate, "This Article reproduces the substance of Article 3073 of the Louisiana Civil Code of 1870. It is not intended to change the law."  *Id.*

*Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 480 (5th Cir. 2002).

The Fifth Circuit also noted:

> [t]he burden of proving the scope of a release falls on the defendant, because the essence of release is res judicata, an affirmative defense. Such proof can include reference to extrinsic evidence because, even though Louisiana courts generally interpret a contract from within its four corners, they "have crafted a special exception to the extrinsic evidence rule for compromise agreements.

*Copeland*, 278 F.3d at 480-481(citations omitted).[7]   The Fifth Circuit then emphasized, importantly, as the language of article 3073 suggests, if the releasor "did not intend to release certain aspects" of a claim, extrinsic evidence is admissible to establish "whether unequivocal language in the instrument was intended to be unequivocal." *Copeland*, 278 F.3d at 481.

Louisiana courts have limited the jurisprudential rule that parties to a release instrument are permitted to raise a factual issue as to whether unequivocal language in the instrument was intended to be unequivocal to cases in which:

> substantiating evidence is presented establishing either (1) that the releasor was mistaken as to what he or she was signing, even though

---

[7]   In construing the release before it, the Fifth Circuit also noted that, "[w]hile the intent to compromise is usually, under Louisiana's transaction jurisprudence, an issue of fact that is not appropriate for summary judgment, this case involves the kind of "explicit and detailed" contract of compromise, along with a set of almost uncontroverted facts, that would permit summary judgment in a Louisiana court.  *Copeland* at 482*, citing Hall v. Management Recruiters of New Orleans, Inc.*, 332 So.2d 509, 511 (La. App. 4th Cir. 1976).

fraud was not present; or (2) that the releasor did not fully understand the nature of the rights being released or that the releasor did not intend to release certain aspects of his or her claim. When the factual circumstances surrounding the execution of the release instrument do not fall within either of the above categories, Louisiana courts, applying LSA-C.C. Art. 2046's general rule of construction, have not hesitated to confine their analysis to the four corners of the instrument.  When, as in that instance, a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and thus summary judgment is appropriate.

*Brown*, 630 So.2d at 749 -750 (citations omitted).

### 2.  The Parties' Contentions

Numerous briefs have been filed by the parties addressing the scope of the release and the admissibility of plaintiff's submissions.  Succinctly, the parties' contentions are as follows.  Chevron contends that the Release speaks for itself and clearly and unambiguously extends to the release of the claims of permanent damage in this case [Chevron's Memorandum in Support of Motion for Summary Judgment, Rec. Doc. 24, pp.6- 9].

In response, plaintiffs argue that, clauses of the Release read as a whole, evidence a limited release of defendants having to clean-up the sites where the tanks, pits and other installations in connection therewith were located and in no way released claims for permanent contamination or the spread of permanent contamination to other areas [plaintiffs' Memorandum in Opposition to Chevron's

15

Motion for Summary Judgment, Rec. Doc. 26, p. 5].  Plaintiffs rely on the Walet affidavit, asserting that the attending circumstances surrounding the Release involved defendant uprooting their oil operations equipment, burying all unwanted equipment and debris into the ground, and leaving the top-surface in disarray with debris buried underneath [plaintiff's Opposition to defendant's Motion for Summary Judgment, Rec. Doc. 26, p. 5].  Plaintiff's further assert, based on the Walet affidavit, that crop growth at the small area at the former tank battery site was stagnant and defendant assured that normalcy would be restored for crop growth in a maximum of three years from the date of the release [Id.].  Further relying on the Walet affidavit, plaintiffs assert that permanent contamination and spread of contamination to other property was never considered in the release because defendants' concealed their activity in disposing hazardous waste onto plaintiffs' land" [Id.]. Plaintiffs further contend that Chevron's attempt to have the release applied to plaintiffs' contamination claim leads to an absurd consequence that was never contemplated when the release was confected,  and that Chevron seeks to take unfair advantage of plaintiffs and unjustly enriches itself at plaintiffs' expense by expanding the release beyond what was intended [Id.].

Plaintiffs also argue that custom may be employed to modify a contract, referencing the Griffin affidavit to support their contention that the "particular release

in question was customarily intended to cover the plugging and abandonment of wells and removal of equipment at the well, and did not cover property damage that extends beyond the immediate vicinity of the well" [Id. at p. 6]. Plaintiffs' further contend that "[t]he release in question was drafted by defendants who are in a superior knowledgeable position over plaintiffs as to oil and gas contracts and better prepared to safeguard their position by expressly including a release of any 'contamination' claims to the property;" and "failed to use language that could have clearly provided for a waiver of any future contamination claims and this evidences defendants' lack of intent to compromise such future action." [Id. at 6-7]. Plaintiffs argue that they "were not informed about any permanent contamination and the spreading of contaminates by defendant in negotiating the release agreement; therefore plaintiffs' were not [able] to fully understand the rights defendants assert as being released and the resulting consequences;" and "that the parties did not contemplate releasing an enlarged area of contamination or the spreading of contaminates" so that "the release should be strictly and narrowly construed against defendant and not cover such future claims" [Id.].

In response, Chevron moved to strike plaintiffs' submissions, arguing that the Griffin affidavit is inadmissible as it is irrelevant and that both the Griffin and Walet affidavit amount to inadmissible parol evidence [defendant's Motion to Griffin

Affidavit, Rec. Doc. 29 at p. 2]; [Chevron's Memorandum in Support of Motion to Strike Walet Affidavit, Rec. Doc. 28, Chevron's Supplemental Memorandum in Support of Motions to Strike Walet and Griffin Affidavits, Rec. Doc. 37].[8] Chevron contends that the Walet and Griffin affidavits should not be considered as the terms of the contract are clear and explicit and lead to no absurd consequences so that no further interpretation may be made in search of the parties' intent; and that the Griffin affidavit is irrelevant as he was not a party to the Release and cannot attest to plaintiffs' intent or to what the parties were thinking at the time they entered in the 1973 Release  [Chevron's Memoranda in Support of Motions to Strike Affidavits of Herman Walet and William Griffin, Rec. Doc. 28; Rec. Doc. 29, pp. 5-6; Chevron's Supplemental Memorandum in Support of Motions to Strike Walet and Griffin Affidavits, Rec. Doc. 37].

In reply, Chevron asserts that it has met its burden because the document's language releasing Texaco "[F]rom **all claim or claims, demand or demands, damages, actions, cause or causes of actions** by reason of or arising out of drilling,

---

[8]     Chevron asserts in a conclusory fashion that the affidavits do not comply with the Federal Rules of Evidence, Rules 402, 602, 603 and 802 or with Rule 56(e) [defendants' Memorandum in Support of Motions to Strike Walet and Griffin Affidavits, Rec. Docs. 28, 29].  Chevron indicates, however, in its Supplemental Memorandum, Rec. Doc. 37, p. 4, that the basis of its motions to strike are irrelevancy and inadmissible parol evidence as to Griffin and inadmissible parol evidence as to Walet.  As such, to the extent that Chevron objects to the affidavits on any other basis, such objection will not be considered as unsupported.

producing and abandonment of Texaco No. 6 Kling-Walet" well clearly and unambiguously encompasses all damages to plaintiffs' property, including damages of "permanent contamination" so that plaintiffs' contention that "permanent contamination" is not included because it is not specifically referenced as a particular item of damage contradicts the Release's express wording [defendant's Supplemental Memorandum in Support of Motion for Partial Summary Judgment, Rec. Doc. 32, pp. 2-3, emphasis added].   Chevron again argues that the words of the Release are clear and that an understanding of the instrument's language referencing "all claim or claims, demand or demands, damages, actions, cause or causes of action" requires no superior knowledge and that Louisiana law precludes any analysis of the parties' intent at the time of the drafting, so that the Release should be the sole evidence considered by the Court [Id. at 4].  However, contrary to this argument, Chevron has, at the same time, submitted in support of its Motion for Summary Judgment a 1968 Release agreement between the parties, citing the following language:

> [R]elease and forever discharge said Texaco Inc., its successors and assigns, and any and all person employed by or connected with it, of and from all claim or claims, demand or demands, damages, actions, cause or causes of actions by reason of or arising out of past, present and future loss of approximately 1.0 acre of crops by operations for or in connection with Texaco Inc. No. 26 Kling-Walet well in section 21, Township 11 South, Range 6 East, Iberia Parish, Louisiana.

[Id. at 5].  Chevron argues that this language as opposed to the language of the

19

Release at issue specifically limits the damages to losses relating to one acre of crops and that if the parties intended to limit the Release to crop growth they would have worded it as above [Id.].

In their Memorandum in Opposition to Chevron's Motion to Strike and Partial Summary Judgment [Rec. Doc. 34, p. 3], plaintiffs emphasize that the Release contemplates contamination due to "residue from a back-filled saltwater pit at the former tank battery site" which "reduced crop growth in a small area of the site." Based on this language, plaintiffs argue that they agreed to settle claims related to **residue** from the saltwater pit and in no way contemplated defendants' intentional disposing, pumping, storing, discharging, and releasing toxic pollutants onto and into the ground, ground-waters, and subsurface waters owned by plaintiffs' [Id., emphasis added]. Plaintiffs argue that Chevron's focus on the one clause in the Release that states, "[f]rom all claim or claims, demand or demands, damages, actions, cause or causes of actions by reason or arising out of drilling, producing or abandonment of Texaco No. 6 Kling Walet well" fails to refer to other clauses, specifically the clause referencing "residue," that the Court must consider as a whole and particularly point out the clause referencing "residue" [Id. at 5].

As to the admissibility of the Walet and Griffin affidavits, plaintiffs contend that, since Chevron is attempting to have the Court extend the Release to a dispute

20

which plaintiffs' never contemplated or intended to release, then their submissions of extrinsic or parol evidence is admissible for consideration by the Court to determine what differences the parties intended to settled [Id. at 4].  Plaintiffs' rely on the Walet affidavit, indicating that it states facts with personal first hand knowledge of the confection of the compromise, and that it supports plaintiffs' contention that the scope of the Release does not contemplate permanent contamination to plaintiffs' property or the migration of contaminants to plaintiffs' adjacent property [Id. at 5].   Plaintiffs' rely on the Griffin affidavit for his "expert knowledge and familiarity with oil releases of this nature" to show that if something other than residue was left in the area, defendant would have superior knowledge of its existence and have gained an unfair advantage over plaintiffs [Id.].  Thus, based on the language of the Release and based on the affidavits submitted, plaintiffs contend that Chevron has not met its burden because it does not present any evidence toward the scope of the agreement [Id. at 6].

Defendant opposes plaintiffs' argument that the Release was intended to cover only those claims relating to **residue** from the saltwater pit on a procedural basis as untimely[9] and on the substantive basis that the Release's third paragraph regarding

---

[9]    Chevron argues that plaintiffs' arguments that the language "residue" in the Release indicates that its scope was only to extend to those claims relating to residue from the saltwater pit rather than contemplating defendants' intentional activity regarding toxic

residue and crop growth merely addresses additional claims under the Release and in

no way limits plaintiffs' damages only to those claims [defendant's Supplemental

Memorandum in Support of Motions to Strike Walet and Griffin Affidavits, Rec.

Doc. 37, pp. 2-4].

### 3.  Analysis

Chevron's arguments have failed to recognize the jurisprudential exception to

the extrinsic evidence rule for compromise agreements. Quoting its earlier decision,

*Copeland*, *supra*, which in turned quoted *Brown*, *supra*, the Fifth Circuit in *Smith v.*

*Amedisys, Inc.*, 298 F.3d 434, 445 (5th Cir. 2002), reiterated that proof of the scope

of a release can include extrinsic evidence, and that even though Louisiana courts

generally interpret a contract from its four corners, they have crafted a special

exception to the extrinsic evidence rule for compromise agreements.  As noted herein

above, a  releasing party seeking to admit evidence under the exception, however,

must present substantiating evidence that he or she was mistaken as to what he or she

---

pollutants are untimely and are a means to obtain a "second bite at the apple" as
plaintiffs' have already filed a timely opposition to its Motion for Partial Summary
Judgment [defendant's Supplemental Memorandum in Support of Motions to Strike
Affidavits of Herman Walet and William Griffin, Rec. Doc. 37, p. 2].  Although Chevron
is correct in that plaintiffs' argument based on the construction of the language in the
Release referring to "the residue from a back-filled saltwater pit at the former tank battery
site" is untimely, having not been earlier raised in its opposition to Chevron's Motion for
Partial Summary Judgment, as Chevron has addressed the argument on its merits and has
neither argued nor shown any prejudice, plaintiffs' argument will be considered.

was signing, even though fraud was not present; or (2) that he or she did not fully

understand the nature of the rights being released or that he or she did not intend to

release certain aspects of his or her claim.  *See id., citing Brown*, 630 So.2d at 749.

The Fifth Circuit continued:

> The issue presented here is whether the Separation Agreement reflects
> that the parties clearly comprehended a release of claims under
> Louisiana employment discrimination statutes. Because the parties
> dispute the scope of the Separation Agreement, extrinsic evidence would
> ordinarily be considered. The extrinsic evidence exception, however, is
> inapplicable here. Amedisys relies solely on the language of the
> Settlement Agreement and Smith has not presented substantiating
> evidence that she was mistaken as to what she was signing, that she
> misunderstood the rights being released, or that she did not intend to
> release certain aspects of her claim.  Thus, our interpretation of the
> parties' intent will be governed by the four corners of the Separation
> Agreement.

*Smith*, 298 F.3d at 445 (footnote omitted).  The court noted that Smith merely

testified, without further explanation that she did not understand the meaning of

Paragraph 2 of the Settlement Agreement.  *Smith*, 298 F.3d at FN 6.

In contrast, plaintiffs have submitted evidence to support their claims that they

did not intend to release their claims for permanent contamination which have been

alleged in this matter, and the Court is of the opinion that the evidence submitted is

the type of substantiating evidence that the exception addresses.  Specifically, the

Walet affidavit raises issues that the Release was not intended to extend to claims for

permanent contamination as Chevron concealed toxic dumping during their operations on the Section 21 property.  As to the Griffin affidavit, although he was not a party to the Release, the Court finds the affidavit, taken as a whole, to be relevant to the extent that it provides evidentiary support to plaintiffs' claims that they were unaware of that potentially hazardous materials, eg. something other than residue, was left on the property after abandonment.  Accordingly, the Court will deny Chevron's Motions to Strike.

Turning to the consideration of whether Chevron has met its burden of showing that plaintiffs have released their claims as to Well No. 6, the Court notes that, in *Brown*, *supra*, the Supreme Court cited *Ingram Corp. v J. Ray McDermott & Co*., 698 F.2d 1295 (5th Cir. 1983) among other decisions to illustrate that Louisiana courts have not hesitated to confine their analysis to the four corners of a Release instrument when the factual circumstances surrounding the execution of the release agreement do not fall within the jurisprudential exception.  *Ingram* involved a plaintiff who sought to vitiate a release that contained broad and express language several years after it had been executed by asserting that the defendant had failed to disclose an existing, on-going anti-trust conspiracy during the negotiations leading up to the execution of the release.  The releases at issue in *Ingram* provided:

[Plaintiff] has *remised, released, and forever discharged,* and by these

presents does, for itself and for its successors and assigns, remise, release and forever discharge [Defendant] and each and every one of [its] past and present officers, directors and stockholders and each of them, and their respective heirs, executors, administrators, successors and assigns, *of and from all manner of actions, causes of actions,* suits, debts, dues, sums of money, accounts, reconings [sic], bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, *damages, controversies,* Judgments, executions, claims and demands whatsoever in law, in admiralty, or in equity which against them or any of them, [Plaintiff] or its successors or assigns hereafter can, *shall or may have,* in its own right or in a representative capacity, for, upon or by reason of any matter, *cause or thing whatsoever from the beginning of the world to the day of these presents, including without limitation of the generality hereof, any past, present or future claims, matters, causes or things that [Plaintiff] has or may hereafter have arising out of, based upon or in any way relating to the Purchase Agreement, the Subcontract Agreement,* and the Agreement regarding INGRAM DERRICK BARGE NO. 6, dated November 16, 1971, by and between [Plaintiff] and [Defendant] ... and the transactions contemplated thereby, . . . .

*Ingram Corp.*, 698 F.2d at 1311 (emphasis added).   The Fifth Circuit affirmed summary judgment in favor of defendants, stating:

A court is entitled to take words spoken so clearly in their ordinary and plain sense. "Unmistakably clear" language which is contained in releases negotiated by commercial parties with substantially equal bargaining power should be construed to mean what it says. It does not matter that Ingram may not have known of or articulately considered all the possible claims it was relinquishing against McDermott. Nor is this situation altered because the record is equivocal as to whether antitrust claims were ever a primary consideration during either the negotiations to sell Ingram's marine construction business or settlement of the parties' outstanding controversies. These factors alone do not require a court, absent very exceptional circumstances, to vitiate otherwise valid releases. This is especially true when the party asserting the invalidity of the releases has made insufficient factual allegations to show that the

releases were procured by accident, mutual mistake, fraud, duress, or any other tactic that overbore or distorted his will which may have caused him to act in a way other than sound business judgment would have ordinarily dictated.

Thus, Ingram cannot escape the validity of the releases by merely asserting ignorance of its antitrust claim.  Indeed, it may be unaware of many claims existing in its favor.  When a release provides that "any and all claims," "past, present, or future" are to be extinguished, a court is required to enforce its provisions both as to known and unknown claims. A contrary result would not contribute significantly to the public policy of encouraging the settlement of differences and compromise of disputes in which the execution and exchange of releases is the common and legally accepted means of consummation.

*Id.* at 1312.  The Fifth Circuit noted, however, that it was "buttressed in its decision by the omnipresence of high level executives and competent counsel throughout the entire business activities.  The settlement of the many controversies between these parties was no fly-by-night transaction.  After months of wrangling and negotiating, the executives of Ingram and McDermott exchanged letters outlining proposed settlement terms."  *Id.*   The Fifth Circuit noted the parties' characterization of the contracts in dispute as "general releases." *Id*. at 1310.  The court referenced the first part of the document as reading expressly like general releases in that the releasor agreed to release "all claims and demands whatsoever in law."  The court noted that "general" was used in its all comprehensive sense-covering *all* claims of any character whatsoever, whether known or unknown, hence the anachronistic but still vivid use

of the language covering claims "from the beginning of the world to the date of these presents." *Id.*    The court also noted that at the end of the this sentence, specific reference was made to the release and settlement of all claims "arising out of based upon, or in any way relating to the purchase agreement . . . ." *Id.*  The Fifth Circuit noted that the releases had general and specific characteristics; they were general in the same sense that every claim between the parties under the sun, no matter when it arose or whether it has yet arisen, is encompassed by the release and that it is specific in that it covered any and all claims which may have arisen from the sale of the Ingram business.  *Id.* at 1310.  The court found that the plaintiff's conspiracy claims were claims arising out of the sale.  *Id.* at 1310–1311.

Utilizing the Fifth Circuit's analysis in *Ingram*, the Court notes that the Release at issue is specific in that it relates to all claims arising from the operation and abandonment of Well No. 6.  In the initial sentence, the releasors "have released and forever discharged, . . . and do release and forever discharge said TEXACO, Inc., it successors and assigns, . . . from  all claim or claims, demand or demands, damages, actions, cause or causes of action by reason of or arising out of drilling, producing and abandonment of Texaco No. 6 Kling-Walet well and the clean-up of the sites of tanks, pits and other installations in connection therewith . . .".  The release then adverts to the particular agreement in which the releasors recognized that residue from a back-

27

filled saltwater pit had reduced crop growth in a small area and particularly agreed that no further claims or demands would be made in connection therewith.

However, unlike in *Ingram*, in the case at bar, the sole evidence of the factual circumstances surrounding the negotiation of the Release has been submitted by plaintiffs. While Chevron has submitted a 1968 Release agreement which specifically limited the release of claims to one acre of crop loss to show that the Release at issue was meant to extend to the claims for permanent contamination at issue, Chevron has presented no factual information of the circumstances surrounding the execution of the 1972 Release to counter Walet's declaration that there was never any mention of property contamination during the settlement negotiations or otherwise provided information regarding the parties' negotiations. On the other hand, plaintiffs have submitted evidence to raise an issue of fact that Texaco, as Chevron's predecessor in interest, concealed evidence of toxic waste disposal during settlement negotiations.

Based on the substantiating evidence presented by plaintiffs, the Court finds that genuine issues of fact have been raised whether the language of the Release at issue was intended to unequivocally extend to the claims in the matter at bar. Accordingly, Chevron's motion for partial summary judgment as to all claims relating to Well No. 6 on the basis of plaintiffs' settlement and compromise with be denied.

## IV.  Prescription

Chevron alternatively argues that, should the Court allow the introduction of the Walet affidavit, it establishes that plaintiffs' claims have prescribed [defendant's Supplemental Memorandum in Support of Motion for Partial Summary Judgment, Rec. Doc. 32].  Chevron argues that, assuming that Walet's declarations are true and that plaintiffs entered into the Release due to their reliance upon Texaco's alleged representation that normalcy would be restored for crop growth in a maximum of three years of the date of the 1973 Release (which Chevron denies), plaintiffs' claims have prescribed, as they would have had one year from the end of the three-year period, the amount of time allegedly represented by Chevron for there to be crop growth, to bring a claim against Chevron in tort when their crops had not returned back to normal based on La. C.C. art. 3492.  Chevron argues that plaintiffs' failure to timely assert such a claim renders it prescribed and subject to dismissal with prejudice.

Plaintiffs argue that Chevron has disregarded the rules of civil procedure to plaintiffs' prejudice by raising the defense of prescription without properly motioning the Court  [plaintiffs' Memorandum in Opposition to Chevron's Motion to Strike and Partial Summary Judgment, Rec. Doc. 34, p. 8].  Plaintiffs continue that they have not been served with any notice about a Motion for Prescription set for hearing on July 19, 2007 and that the only matters before the Court are (1) defendants' Motion for Partial

Summary Judgment related to a release agreement and (2) defendants' Motion to Strike Affidavits of Herman Walet and William D. Griffin for inadmissible parol evidence [Id. pp. 8-9]. Plaintiffs object to the hearing on the issue of prescription due to defects in notice as to (1) form of the motion; and (2) lack of service of any motion regarding the issue of prescription upon plaintiffs. [Id. at 9]. Plaintiffs specifically deny consenting to and refrain from arguing the motion of prescription on the merits and do not waive their objections [Id.]. As plaintiffs argue, Rule 7 of the Federal Rules of Civil Procedure requires that an "application to the court for an order shall be by motion which, unless made during a hearing or trial, shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought. The requirement of writing is fulfilled if the motion is stated in a written notice of the hearing of the motion."  Plaintiffs also cite *Kelly v. Moore*, 376 F.3d 481, 484 (5th Cir. 2004) for the principle that Rule 7 requires, at a minimum some degree of specificity on the movant's part to afford the Court and plaintiffs with notice of the substance of the basis for the requested judgment [plaintiffs' Memorandum in Opposition to Chevron's Motion to Strike and Partial Summary Judgment, Rec. Doc. 34, p. 9]. Chevron responds that nothing precludes it from addressing prescription once plaintiffs assert facts in their opposition and their opposition shows that plaintiffs' claims have prescribed.

Although brief, Chevron has particularized its motion, contending that plaintiffs' claims have prescribed based on the Walet affidavit, and plaintiffs' Statement of Contested Facts No. 6, alleging that crop growth at the small area at the former tank battery site was stagnant and defendant assured plaintiffs that normalcy would be restored for crop growth in a maximum of three years of the Release [defendants' Supplemental Memorandum in Support of Motion for Summary Judgment, Rec. Doc. 32, p 6].

Although plaintiffs' object to form and lack of service of any motion, plaintiffs have not supported their argument that they are unable to respond to Chevron's motion on the basis of prescription as it is insufficiently particularized.   Accordingly, plaintiffs will be allowed ten days from the date of the entry of this order to file their opposition, if any there be.  Chevron will be allowed seven days thereafter to respond.

## V.  Conclusion

For the reasons stated herein above, Chevron's Motion for Partial Summary Judgment [Rec. Doc. 24] will be  denied to the extent that it seeks a partial summary judgment dismissing all claims related to No. 6 Kling-Walet well and deferred as to its alternative motion that plaintiffs' claims have prescribed pending plaintiffs' response.  Further, Chevron's Motions to Strike the Walet and Griffin Affidavits [Rec. Docs. 28, 29] will be denied.

31