RECEIVED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE 12-20-

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| Kling Realty Co., Inc. | Civil Action No. 06-1492 |
| versus | Judge Tucker L. Melançon |
| Texaco, Inc., et al | Magistrate Judge Methvin |

## MEMORANDUM RULING

Before the Court is Chevron USA, Inc.'s Motion for Partial Summary Judgment based on prescription [Rec. Doc. 24], plaintiff's Motion and Order to Add Non-Diverse Party and Remand to State Court [Rec. Doc. 41], plaintiff's Motion for Sanctions [Rec. Doc. 69] and Chevron's Motion to Strike Motion and Motion for Sanctions [Rec. Doc 71]. For the reasons that follow, plaintiff's Motion to Add Non-Diverse Party and Remand to State Court is moot, Chevron's Motion for Partial Summary Judgment on the basis of prescription will be granted, plaintiff's Motion for Sanctions will be denied, Chevron's Motion for Sanctions will be denied and Chevron's Motion to Strike will be denied as moot.

### I. Background

On June 30, 2006, plaintiffs filed a Petition for Damages in the Sixteenth Judicial District Court for the Parish of Iberia, State of Louisiana, and on August 30, 2006 the action was removed to this Court. *R. 1, Complaint.* Plaintiffs sought compensatory and punitive damages from Chevron, as successor in interest to Texaco, Inc. and Texaco Exploration and Production, Inc., and other named

defendants, Estis Well Service, LLC and Jack P. Martin, Sr. *Id.*[1] Plaintiffs allege that they are the lessors, assigns and/or successors in interest to certain Oil, Gas and Mineral Leases between plaintiffs and defendants and that they own certain real property located in Iberia Parish, Louisiana, Sections 21 and 22, Township 11 South, Range 8 East. *Id., ¶¶1, 4.* Chevron asserts that this property is known as the Fausse Point Field. *R. 24, p. 1.* Plaintiffs allege further that Chevron, in addition to the other named defendants, "conducted, directed, controlled or participated in various oil and gas exploration and production activities as operators and/or working interest owners, and/or joint venturers in the Fausse Point Field," and that the subject property was contaminated or otherwise damaged by defendants' oil and gas exploration and production activities. *Id., ¶¶1, 7.*

Plaintiffs allege still further that, since at least the 1930's, defendants have known that the disposal of oilfield wastes in unlined earthen pits or directly to waterways inevitably results in seepage, which contaminates both surface and subsurface soils and waters. *Id., ¶9.* Plaintiffs' Complaint alleges:

> [d]efendants knew or should have known that their day to day operations in the Fausse Point Field would cause the soil, surface waters, and ground waters of Plaintiff's property to erode and to be contaminated with the substances described . . . Rather than repairing that erosion or removing these substances during or after oil and gas exploration and production activities, defendants chose to ignore this erosion and to conceal and cover up this contamination. This concealment and cover up was routine practice. The defendant's failure to timely remove or remediate this toxic pollution in the soils and ground waters of Plaintiff's property has allowed the pollution to migrate and spread.

---

[1]  Plaintiffs' claims against Estis Well Service, LLC and Jack P. Martin, Sr. were dismissed on January 8, 2007 [Rec. Doc. 19].

*Id., ¶14.*

In a motion for partial summary judgment [Rec. Doc.24] filed on May 21, 2007, Chevron raised, among other defenses, the affirmative defenses of waiver and/or release and of accord and satisfaction to plaintiffs' claims, arguing that plaintiffs and/or their predecessors in interest relinquished all rights and legal claims for damages arising from Chevron's operation of No. 6 Kling-Walet well, ("Well No. 6" or "No. 6 Kling-Walet well"), pits, tanks installation and other equipment association with Well No. 6, and raised a defense of no cause of action. Chevron asserted that plaintiffs and/or their predecessor in interest had entered into a Release Agreement with Texaco Inc. dated September 12, 1973, ("the Release"), the pertinent parts of which follow:

> [Plaintiffs] have released and forever discharged, and by these presents do release and forever discharge said TEXACO Inc., its successors and assigns, and any and all persons employed by or connected with it, of and from all claim or claims, demand or demands, damages, actions, cause or causes of actions by reason of or arising out of drilling, producing and abandonment of Texaco No. 6 Kling-Walet well and the clean-up of the sites of tanks, pits and other installations in connection therewith, in the Southeast Quarter of Section 21, Township 11 South, Range 8 East, Iberia Parish, Louisiana.
>
> It is also understood and agreed that we, the undersigned, assume full responsibility for restoring the area disturbed by Texaco's operations to its former condition.
>
> It is recognized by the undersigned that the residue from a back-filled saltwater pit at the former tank battery site has reduced crop growth in a small area at the site, and the undersigned particularly agree that no further claims or demands will be made in connection therewith.

The Release indicates a consideration paid of $4,140.00. Kling-Walet Well No. 6 is located on Section 21 of plaintiffs' property [Chevron's Statement of

3

Uncontested Material Facts, Rec. Doc. 24, No. 3].

Chevron's motion for partial summary judgment requested judgment dismissing plaintiffs' claims arising from Chevron's operation of Well No. 6 on the basis that plaintiffs had compromised all of those claims for damages, and for judgment dismissing plaintiffs' claims relating to Section 22 as it has conducted no drilling operations on Section 22. *R. 24.* In a supplemental memorandum, Chevron alternatively argued that plaintiffs' claims for damages related to Well No. 6 Section 21 had prescribed and that plaintiffs failed to carry their burden of proof as to their Section 22 Claim. *R. 32.* On November 20, 2007, the plaintiffs filed a Motion To dismiss the Section 22 Claims. [Rec. Doc. 99] and those claims were dismissed on December 18, 2007. [Rec. Doc. 108].

On September 11, 2007, the Court issued a Memorandum Ruling denying Chevron's motion for partial summary judgment on the issue of whether the Section 21 claim had compromised and deferred ruling on the issue of whether or not plaintiffs' Section 21 claims had prescribed. *R.49.* The Court also issued an Order requiring that plaintiffs file any opposition to Chevron's motion for summary judgment on the basis of prescription within ten days. *R. 50.* Plaintiffs filed an opposition to Chevron's motion on September 21, 2007. *R. 53.*

On August 16, 2007, plaintiffs filed a Motion and Order to Add Non-Diverse Party and Remand to State Court. *R. 41.* Plaintiffs move the Court to allow the adding of a non-diverse defendant, M&C Contractors, Inc., and to remand plaintiffs' claims to the 16th Judicial District Court, Parish of Iberia,

4

Louisiana, pursuant to 28 U.S.C. 1477c. Chevron filed an opposition to plaintiffs'

motion, *R. 55*, and plaintiffs filed a supplemental memorandum. *R. 84.* On

October 19, 2007, plaintiffs filed a Motion for Sanctions, *R. 69,* and, in response,

Chevron filed a Motion to Strike Plaintiffs' Motion for Sanctions and a Motion for

Sanctions. *R. 71.* Oppositions to each of these motions have been filed by each

side. *R. 76; 78.* The parties have supplemented the record with memoranda

related to the 30(B)(6) deposition of Chevron's representative, George H. Sellers.

*R. 56; 60; 63.*

For the reasons set out here and after, the Court will grant Chevron's

Motion for Partial Summary Judgment on the basis of prescription. The Court will

none the less initially address plaintiffs' Motion and Order to Add Non-Diverse

Party and Remand to State Court, then Chevron's motion for partial summary

judgment on the basis of prescription and lastly, the motions for sanctions and the

motion to strike.

## II. Summary Judgment Standard

Summary judgment is proper when the pleadings and evidence on file show

that no genuine issue exists as to any material fact and that the moving party is

entitled to judgment as a matter of law. Fed.R.Civ. P. 56(c). The movant must

inform the court of the basis of its motion and identify the portions of the record

which reveal there are no genuine material fact issues. *See Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986). "In adjudicating a motion for summary

judgment, the court must view all facts in the light most favorable to the

non-movant." *Adams v. Travelers Indem. Co. of Conn.*, 2006 WL 2620585, 3 (5th Cir. 2006). The function of the court, therefore, is to make the threshold inquiry of determining whether there is a need for a trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the movant makes this showing, the nonmovant must demonstrate that there is evidence in the record establishing that there is a genuine issue of material fact for trial. *Celotex* at 323-24. To carry this burden, the opponent must do more than simply show some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A dispute as to a material fact is "genuine" under Rule 56(c) only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 251-52. The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to preclude a grant of summary judgment. *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir.1999). The opponent must present evidence sufficient to support a resolution of the factual issue in his favor. *Anderson*, 477 U.S. at 248-52. The court may properly enter summary judgment against a party if that party fails to establish the existence of an element essential to the case and as to which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-24. Summary judgment is also appropriate when the only issues to be decided in the case are issues of law, or when the non-moving party's claims are legally deficient. *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063, 1065 (5th Cir.1995). When the facts are disputed, the court does not determine the credibility of the evidence and draws all justifiable

6

inferences in favor of the nonmovant. *Bledsoe v. City of Horn Lake, MS* , 449 F.3d. 650, 652-53 (5th Cir.2006).

### III. Analysis

#### A. Plaintiffs' Motion to Add Non-Diverse Party and Remand to State Court

Assuming *arguendo* that the Court had not found the plaintiffs' claims have prescribed, the plaintiffs' Motion and Order to Add Non-Diverse Party [M&C Contractors, Inc. ("M&C")] and Remand to State Court would none the less be denied as plaintiffs have not met their burden entitling them to add M&C as a non-diverse party.

Plaintiffs allege in their amended complaint and supporting memorandum that M&C, a Louisiana clean-up company, "knowingly disposed of toxic and hazardous materials" and that their actions constituted "wanton or reckless disregard to public safety in storage, handling or transportation" of such substances. *R. 41.* Chevron opposes plaintiffs' motion to amend and remand asserting that the attempted joinder of M&C should be denied under 28 U.S.C. §1447(e) and the analysis set out under *Hensgens v. Deere & Co.*, 833 F.2d 1179, 1182 (5th Cir. 1987).

Where a party seeks to add a non-diverse party in a removed case, such as in this case, the Court's analysis is controlled by Title 28, United States Code, section 1447. *See Hensgens* at 1180-1181. Section 1447(e), provides

> If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court.

28 U.S.C. §1447(e).

"The decision to allow an amendment adding non-diverse parties under Section 1447(e) is a discretionary one." *Hensgens* at 1182.[2] The district court, when faced with an amended pleading, naming a new non-diverse defendant in a removed case, should scrutinize that amendment more closely than an ordinary amendment. *Id.* The court should consider a number of factors including: (1) the extent to which a joinder of the non-diverse party is sought to defeat federal jurisdiction; (2) whether plaintiff has been dilatory in asking for the amendment; (3) whether plaintiff would be significantly injured if the amendment was not permitted; and (4) any other factors bearing on the equities. *Id.* "Section 1447(e) authorizes a court to permit or prohibit joinder, and the defendant thus has an opportunity at the time joinder is considered to prevent joinder by arguing that there is no colorable claim against the party the plaintiff is seeking to join." *Cobb v. Delta Exports, Inc.*, 186 F.3d 675, 677 (5th Cir.1999). The fraudulent joinder doctrine does not apply to post-removal joinder. *Id.* at 678. Rather, post-removal joinder of a non-diverse defendant destroys diversity for jurisdictional purposes and requires remand. *Id.* at 676; *Hensgens*, 833 F.2d at 1181. Applying the factors set out in *Hensgens*, the court must balance the defendants' interests in maintaining the federal forum with the competing interests of not having parallel lawsuits in deciding whether to permit plaintiffs' amendment. *Hensgens*, 833 F.2d at 1181.

Chevron asserts that plaintiffs' joinder of M&C is sought to defeat federal

---

[2] Although *Hensgens* was decided before 28 U.S.C.§ 1447 was amended to include subsection (e), the Fifth Circuit has cited *Hensgens* with approval after the passage of § 1447(e). See *Tillman v. CSX Transportation, Inc.*, 929 F.2d 1023 (5th Cir. 1991).

jurisdiction, *Hensgens* factor 1, in that plaintiffs have no viable cause of action against M&C.  Under *Hensgens*, "[a] request to join a party against whom recovery is not really possible and whose joinder would destroy subject matter jurisdiction (i.e., a request fraudulently to join a party) would never be granted.  Section 1447(e) authorizes a court to permit or prohibit joinder, and the defendant thus has an opportunity at the time joinder is considered to prevent joinder by arguing that there is no colorable claim against the party the plaintiff is seeking to join. There is no need, then, for a doctrine that ignores parties who are fraudulently joined after removal, for such parties would never be allowed to become defendants in the first place."  *Cobb v. Delta Exports, Inc,* 186 F.3d 675, 677 -678 (5th Cir. 1999).

In this case, plaintiffs allege in their Proposed Amended Complaint that M&C "conducted remediation/cleanup or participated in various oil and gas exploration and production activities." *R. 40, ¶II, 7.*  As a clean-up contractor, plaintiffs allege that M&C "knowingly disposed of toxic and hazardous materials" and their actions constituted "wanton or reckless disregard to public safety in storage, handling or transportation of hazardous or toxic substances."  Plaintiffs further allege that M&C is "liable for punitive and exemplary damages [under] La. C.C. art. 2315.3." *Id., ¶IV, 22(a).*  In support of their claim that Chevron prevented them from bringing this action, plaintiffs contend that, despite extensive requests for documents and other information about who may have caused damage to their property, they did not learn that M&C had done any work on their property until they performed additional investigation. Plaintiffs maintain that upon taking the 30(b)(6)deposition of Chevron on September 21, 2007, they learned that the corporate representative, George H.

9

Sellers, had seen a document within the previous two days indicting that M&C had been responsible for performing clean up work on the plaintiffs' property.  Plaintiffs also contend that the Chevron representative "indicated that he had seen lab reports of soil samples taken at plaintiffs' property."  Plaintiffs state that Chevron "withheld or, still worse, destroyed documents relating the M&C's involvement."  *R. 84.*

Chevron argues that plaintiffs have failed to set forth a cause of action against M&C under La. R.S. §30:2466 which specifically precludes a cause of action against a clean-up contractor for claims involving property damages.  La. R.S. §30:2466 provides in pertinent part:

> A. No action or omission taken by any person, including any discharge cleanup organization, to abate, contain, remove, clean up, or otherwise respond to pollution from a threatened or actual unauthorized discharge of oil or refined petroleum product, or to otherwise render care, assistance, or advice, ... shall be construed as an admission of responsibility or liability for the discharge.

> B. .... This Section shall not apply to actions for personal injury or wrongful death or for acts or omissions of gross negligence or willful misconduct.

LSA-R.S. §30:2466.

Chevron further maintains that plaintiffs' claims related to Sellers' testimony are "inappropriate and without merit."  *R. 55, p.6.*  Chevron cites Sellers actual testimony in regards to M&C as follows:

> Q. Okay.  Do you know anything about whether there were any documents in the company relating to M and C Contractors?

> (Objection)

> Q. During the time that you have done searches relating to cleanup of the Kling Walet property, do you ever recall running across or seeing the name of M and C Contractors?

**10**

A.  In the document review there was some discussion regarding M and C Contractors, but just that, I think, that there was some document that showed that M and C had done some work on the property; but without looking at the document, I can't testify to it.

Q.  Can you tell me, do you remember anything else about the document, other than it showed M and C had done some work on the property?

A.  Truly, I don't recall exactly what the document said, except that there was some discussion with my attorney whether or not I know of the existence of M and C.

*R. 55, Exh. B, Depo. Of Sellers, pp. 126-27.*

Chevron represents to the Court that it has "diligently searched for such document,"  and it has uncovered no "information or documents relating to the existence of any clean up contractor for plaintiffs' property or to any clean up of plaintiffs' property in the early 1970's." *R. 55, pp. 7-8.* Chevron further represents that "it located documents pertaining to work performed by M & C in the 1990's relative to property not owned by plaintiffs and not the subject of this proceeding, but none of these documents involved work by M & C on plaintiffs' property - Section 21." *Id.* Sellers' testimony regarding M & C was far from conclusive that he had seen a document establishing that M&C had preformed clean up work on plaintiffs' property. Rather, his testimony indicates he had no independent knowledge of M&C and wasn't sure whether he had actually seen any document related to the contractors and the subject property.

While plaintiffs attempt to name M&C as a defendant clean-up contractor, they fail to provide any evidence demonstrating the possibility of establishing a valid cause of action against the company.   Moreover, plaintiffs have absolutely no support for their allegations that M&C acted with "gross negligence or willful misconduct," and

**11**

are barred from any action against the contractor under §30:2466. Based on the record and the history of this matter, the Court finds that *Hensgens* factor 2 favors neither the plaintiffs nor Chevron while *Hensgens* factor 3 favors Chevron. As to factor 4, based on the dearth of evidence to join M&C and the finding that, in any event, plaintiffs have no "colorable claim" against them, the motion to add the non-diverse company and to remand would have been denied even had the plaintiffs prevailed on the issue of prescription. *Cobb,* 186 F.3d 675(Leave to amend to join a party against whom recovery is not really possible and whose joinder would destroy subject matter jurisdiction, should never be granted).

### B. Whether or Not Plaintiffs' Claims Have Prescribed

Chevron contends that plaintiffs' claims have prescribed as they had one year from the end of 3 years from the date of the 1973 Release, the amount of time stated for there to be crop growth, to bring a claim against Chevron in tort when their crops had not returned to normal. Chevron cites the affidavit of Herman Walet and the 30(b)(6)deposition of Chevron's corporate representative, George H. Sellers as evidence that plaintiffs' claim has prescribed.

Plaintiffs argue that their claims have not prescribed due to the jurisprudential exception to prescription of *contra non valentem non currit praescriptio. R. 53.* Plaintiffs assert they did not know nor have reason to believe they had a cause of action because the extent of their property damage had been concealed by Chevron. *Id.* Plaintiffs cite the affidavits and depositions of Herman Walet and Kerry Bush and the deposition of George H. Sellers in support of their position that defendants concealed the destructive nature of their operations in depositing toxic and hazardous

**12**

waste at Section 21.  Plaintiffs also contend that their claim for breach of the mineral lease is governed by a ten year prescriptive period under La. Civ. Code art 3499, rather than one year for delictual claims. Further, plaintiffs maintain that their claims are subject to the jurisprudence regarding continuing damages.  *Id.*

### 1. Contra non valentem

"Louisiana Civil Code article 3492 provides that delictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained.  Damage is considered to have been sustained, within the meaning of the article, only when it has manifested itself with sufficient certainty to support accrual of a cause of action.  The doctrine of *contra non valentem agere nulla currit praescriptio* prevents the running of liberative prescription where the cause of action is not known or reasonably knowable by the plaintiff."  *Cole v. Celotex Corp.*, 620 So.2d 1154, 1156 (La.1993).  The courts created the doctrine of *contra non valentem* as an exception to the general rules of prescription. *Wimberly v. Gatch*, 635 So.2d 206 (La. 1994).  Generally, the doctrine of *contra non valentem* suspends prescription where the circumstances of the case fall into one of four categories: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and 4) where some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.  *Causby v.*

**13**

*Perque Floor Covering,* 707 So.2d 23, 25, (La.1998).

Though prescription under La. C.C. art. 3492 begins to run from the day injury or damage is sustained, damage is considered to have been sustained only when it has manifested itself with sufficient certainty to support accrual of a cause of action. *Cole v. Celotex Corp.,* 620 So.2d 1154, 1156 (La.1993). "Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury. When prescription begins to run depends on the reasonableness of a plaintiff's action or inaction." *Cole* at 1156 (quoting *Jordan v. Employee Transfer Corp.,* 509 So.2d 420, 423 (La.1987)).

Plaintiffs maintain that they had no knowledge of the severity of the salt content and/or contamination on the property when they signed the Release and that Chevron continually concealed the contamination and prevented plaintiffs from knowing or realizing the extent of the damage. Plaintiffs cite Herman Walet's affidavit and September 13, 2007 deposition testimony in support of their position.

Contrary to plaintiffs' contentions, Walet's deposition testimony provides that he tried to plant sugar cane around former Well No. 6 every three years from the early 1970's until 2006, but that he was always unable to sustain crop growth. *R.59, Exh.3, Depo. Of Herman Walet.* Walet confirmed he was speaking of the same area he alleges Chevron represented to him that crop growth would be sustained within three years of the 1973 Release. When asked why he did not go to Chevron to tell them of

**14**

his continuous problems growing sugarcane in the area, Walet stated, "Because we never thought we had a leg to stand on.... That's the way it was everywhere's like that. If they made damages, people would let it alone." *Id. at pp. 76-79.*

At the deposition of Arthur L. Stern, former Kling Realty president, Stern produced numerous typewritten notes documenting his early 1970's site visits to the property at issue. *R. 88.* Chevron asserts that the deposition of Stern and the documents he produced show that plaintiffs were concerned about damage to the property at issue, including the company's alleged dumping of materials and contamination of the soil, in the early 1970s, before plaintiffs executed the Release in 1973. *R.88; 78, Exh. D, Depo. Of Stern.* In particular, Chevron cites a June 9, 1971 letter from Stern which states the following about one of his site visits:

> Herman Walet also brought up the fact that the woodland was being destroyed, due to the non-conservation procedures which have been carried forward in the past, with the general carelessness of disposing of salt water and other waste products of their operations. I mentioned this in my letter to their [Texaco] Onshore manager, Mr. Rome in my letter to them of May 25th. I have since heard from Herman [Walet] and Texaco has already been out to see him, from their Lafayette Office, and promises to do something immediately to correct the situation.

*R.88, Exh. A, p. Kling0006, ¶4.*

Chevron also cites Stern's letter dated October 7, 1971 which states:

> All of this has come about mainly through joint Kling-Walet "harassment" handled mainly in the past via our ex-representative, Mr. de la Houssaye.
> In addition to this Texaco matter, a second one has arisen, which we intend to handle completely separately, not a part of the lease reduction matter. This is the fact that Texaco over the years has been dumping salt water, oily by-products, chemicals, on Caroline property and has fairly well destroyed its future potential productivity. This came up very clearly very recently, when Texaco cleared some land for us for future cane production. However, the soil is so thoroughly contamination

**15**

with salt and other chemicals, its productivity is virtually zero.
         The destruction of this land for future generations has Herman
Walet quite concerned, and this of course is in direct violation of their
existing lease with us.
*R. 88, Exh. A, p. Kling0006, ¶¶ 6-8.*

Plaintiffs argue that the letters and documents Stern produced at his deposition
show that Chevron made numerous misrepresentations in the form of assurances and
therefore prescription did not begin to run because plaintiffs' concerns were always
addressed to their satisfaction.  *R.88.*  Plaintiffs contend that in 1971, Texaco's
Onshore Manager, Mr. Rome, "promised to do something immediately to correct
plaintiffs' concern about the general carelessness of disposing salt water and other
waste products associated with defendants drilling operations" and plaintiffs were
persuaded by their communications with Mr. Rome and others at Texaco that the oil
company was ecologically conscious. *Id., Exh. 1, 6/21/71 Stern letter*.  The pertinent
portion of the letter states,

Herman Walet also brought up the fact that the woodland was being
destroyed, due to the non-conservation procedures which have been a
[sic] carried forward in the past, with the general carelessness of
disposing of salt water and other water products of their operations.  I
mentioned this in my letter to the Onshore Manager, Mr. Rome, in my
letter to them of May 25th. I have since heard from Herman and Texaco
has already been out to see him, from their Lafayette Office, and
promises to do something immediately to correct the situation. I am sure
they are quite ecologically minded these days, and will do more in this
direction than any other, should their lease be cancelled for this form of
negligent behavior.

*Id.*

Plaintiffs contend that the correspondence indicates "Chevron's plan to respond
to any expression of concern by the plaintiffs with a show of superficial -- but
ineffective -- clean-up operation and then advise plaintiffs that all of their concerns

**16**

were being addressed...." *R.88.* A review of the documents related to the clean-up operation provided by Stern, however, does not indicate environmental clean-up of the salt levels, but rather, a general clean-up of the site at issue, Well #6, Section 21, including removal of debris and drainage issues. *Id., Exh. 5.* Plaintiffs assert that the September 20, 1973 letter from Stern to Mr. and Mrs. Mier stating that the land should be back in normal condition in approximately 3 years, as provided in the Release, supports their position. The letter refers to clean-up of the property prior to execution of the Release rather than a later remediation addressing any concerns plaintiff expressed to Chevron after the 3 year Release ended. Perhaps most significantly, Stern also advises the Miers that "we both agreed that to raise a tremendous fuss over this might be detrimental to our overall excellent working relationship with this [Walet] family" and that the crop damage "may not occur again [] in the next 10 years." *Id., Exh. 3.* Nor does plaintiffs' contention that Herman Walet's affidavit stating that in 1981, Texaco represented to him that the company "would make the necessary clean-up arrangements, and return the property to its original condition," mention any salt water or other contamination. *Id. Exh.7; 8.* What the evidence reveals is plaintiffs' knowledge of "years of dumping salt water, oily by-products, chemicals, on [the] property" which may have "destroyed its future potential productivity."

Both parties point to the April 23, 1973 Louisiana State University Cooperative Services document produced at the 30(b)(6) deposition of Chevron's representative, George H. Sellers taken on September 13, 2007. The document indicates that a soil analysis of a soil sample submitted for testing in order to make "fertilizer

**17**

recommendations for the crops you requested" was enclosed. *R. 56, Exh. B.* The document also contains a handwritten note by Charles Miller to "Pliny" which states "The other sample had a <u>Very High Salt Content</u>. I will mail you a more detailed report on that sample later." *Id.* Plaintiffs contend that the document "is a letter admitting that the plaintiffs' land was severely contaminated." *Id.* Plaintiffs further contend that Chevron concealed the document from discovery and that Chevron should have the analysis in its possession.   It is undisputed that "Pliny" refers to Mr. Pliny Walet, one of the owners of Walet Planting Company.   Contrary to plaintiffs' assertions, the document is clear that the request for soil analysis was made by Pliny Walet and that he received the soil analysis and additional information related to the "<u>Very High Salt Content</u>" which is referred to by Miller. *Id.* Thus, plaintiffs cannot show that the analysis and soil sample were concealed by Chevron, instead, the document points to plaintiffs' knowledge of the extent of salt contamination since at least April, 1973 and plaintiffs have failed to provide any evidence contrary to that position.

As to plaintiffs' assertion that the 30(b)(6) deposition of Chevron's representative, Sellers, provided "damning, binding testimony admitting that the contamination of the plaintiffs' property was not only continuing but *increasing*", *R.56, p.2*, the deposition of Sellers indicates that plaintiffs' characterization of his testimony is at best overstated. According to Sellers' sworn affidavit, which plaintiffs do not dispute, his testimony regarding what plaintiffs' characterize as "contamination damage" or "increasing/continuing damage" to their property is related to the following documents: July 16, 1968 letter, Theodore J. Mace to W.S. Williams;

**18**

August 24, 1971 letter, Division manager to Arthur L. Stern, and; August 14, 1973 Investigation and Report of Estimated Damages. *R.59, Exh. 1-3.* When questioned about these documents, Sellers stated:

> Q.     Has anyone in the company made an effort to record or chart the increase over time of the damaged area?
> A      Not that I'm aware of.
> Q.     I take it, what you're telling me is the company is aware that the damage to the property now is greater than it appeared to be in the past.
> A.     I think there was a claim by Mr. Walet at one point in time that the area had increased, or there was a conversation with someone within Chevron that the area had increased.
> Q.     Do you have any information about whether the company investigated that claim when they learned of it?
> A.     I'd have to review the documents again, but from what I understand, no.
> *R. 59, Exh. 3, Depo. of Sellers, p.102, l. 25 - p.103, l. 21.*

Thus, Sellers' testimony related to documents prior to the 1973 Release fails to provide evidence that Chevron knew plaintiffs' salt contamination was increasing after the 1973 Release through the date plaintiffs' filed their Complaint.

"Under the doctrine of *contra non valentem*, the prescription period does not run when 'the cause of action is not known or reasonably knowable by plaintiff, even though his ignorance was not induced by defendant.' As a judicial exception to the statutory rule of prescription, Louisiana courts strictly construe this doctrine and only extend its benefits up to 'the time that the plaintiff has actual or constructive knowledge of the tortious act.' That is defined as 'the time at which the plaintiff has information sufficient to excite attention and prompt further inquiry.'" *Eldredge v. Martin Marietta Corp.*, 207 F.3d 737, 743 (5th Cir. 2000)(internal citations omitted).

In *Eldredge*, landowners brought suit against towboat companies seeking

19

damages based on allegations of trespass and damage to trees and soil on their property. Plaintiff testified that he knew barges were being tied off to the land and his father once complained to the sheriff in the mid-1960's, but the sheriff took no action and the practice continued. Complaints were made to the Coast Guard in 1993 and suit was filed in 1998. *Id. at 739.* Plaintiffs argued for the application of the doctrine of *contra non valentem. Id. at 737.* The Fifth Circuit concluded that the summary judgment evidence did not justify providing plaintiffs with the benefit of *contra non valentem. Id. at 743.* The court reasoned that plaintiff testified that he knew his father, the predecessor-in-title, had noticed damage to the trees caused by the barges starting in the mid-1960's, and that his father had complained to the sheriff. When the sheriff took no action, the father took no further legal steps to stop the towboat companies from trespassing and damaging the property and did not file suit until 1998. Thus, the *Eldridge* court affirmed the district court's grant of summary judgment, finding that the plaintiffs clearly had knowledge of the tort since at least 1993, and chose not to exercise their duty to seek out those responsible for their injury in a timely manner. *Id.*

As in *Eldredge*, the summary judgment evidence shows that plaintiff had knowledge, dating back to the 1970s, of damage to the same piece of property where plaintiffs currently allege they cannot sustain sugarcane growth and which was the subject of Chevron's prior clean up and plaintiffs' Release of Chevron. Herman Walet testified throughout his deposition that he tried to plant sugar cane around former Well No. 6, that this was the same area previously operated by and cleaned by Chevron, and where Chevron allegedly represented to him crop growth would be sustained within

**20**

three years of the 1973 Release, and that he has been unable to sustain such crop growth. Despite this knowledge, Walet admitted that he made a conscious decision not to approach Chevron to advise the company that he was having problems growing sugar cane in the area. There is no evidence that Chevron prevented plaintiffs from knowing about such damages nor that Chevron concealed the contamination. Even assuming that plaintiffs believed the 1973 Release related to the severe salt contamination, which the evidence does not support, plaintiffs' claim would have prescribed one year after the 3 year period, or in 1977.

Accordingly, based on the jurisprudence as well as the evidence before the Court, particularly the documents produced by plaintiffs' deponent, Stern, and the April 23, 1973 soil analysis and sampling requested by and provided to Pliny Walet from the Louisiana State University Cooperative Services, Charles Miller, the Court finds that plaintiffs had knowledge of the "extremely high" salt contamination of the property and its "virtually zero" productivity, and therefore, cannot rely on *contra non valentem* to prevent the running of prescription in this case.

### 2. 10 Year Prescription of the Mineral Lease

Plaintiffs also allege that Chevron's conduct "constitutes a breach of the oil, gas, and mineral leases which covered the oil and gas activities" and that Chevron breached a contractual obligation in the 1973 Release to "restore Plaintiff's property to its original condition." *R. 1, ¶¶21,22.*

In Louisiana, the prescriptive period for a breach of contract claim is 10 years from the date that the cause of action arose. La. CC. Art. 3499. While a usual contract claim begins to run from the date that the contract was allegedly breached, the

**21**

Louisiana Supreme Court held in *Corbello v. Iowa Production,* 850 So.2d 686, 705 (La. 2003), that a breach of contract claim under an oil and gas production lease arises upon termination of the lease.

In this case, the lease was entered into on February 6, 1946, and terminated either five years from that date, or "as long thereafter as either oil or gas is produced from said land hereunder." *R. 59, Exh. 6, 02/06/46 Lease.* Well No. 6 , on the subject property, was plugged and abandoned on October 21, 1971 and the lease would have expired on October 22, 1971. Thus, plaintiffs' claim prescribed ten years later on October 22, 1981. Even if the lease was maintained until the final release was recorded on August 20, 1974, plaintiffs' contractual claim prescribed on August 20, 1984.

Nor can plaintiffs assert that the breach of the 1973 Release bars the running of prescription. The Release was executed on September 12, 1973 and provided that crops would return to normal in 3 years. Plaintiffs knew that the crop loss was increasing after the 3 year period yet they decided not to file a claim against Chevron until August, 2006. Accordingly, the Court finds that, even assuming the contractual breach was based on the 1973 Release, plaintiffs' claims prescribed on September 12, 1986, ten years after the 3 year period provided for in the Release.

### 3. Continuing Tort

Under the continuing tort doctrine, "continuing and repeated wrongful acts are to be regarded as a single wrong which gives rise to and is cognizable in a single action, rather than a series of successive actions." *Wilson v. Hartzman,* 373 So.2d 204, 207 (La.Ct.App.1979). Multiple acts will constitute a continuing tort "when the acts

**22**

are continuous on an almost daily basis, by the same actor, of the same nature, and the conduct becomes tortious and actionable because of its continuous, cumulative, synergistic nature." *Bustamento v. Tucker*, 607 So.2d 532, 542 (La.1992); *see also Crump v. Sabine River Authority*, 737 So.2d 720, 728 (La.1999)("A continuing tort is occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful act."). If the plaintiffs' claim involves a continuing tort, "then prescription does not commence until the last act occurs or the conduct is abated. *Bustamento*, 607 So.2d at 542." *Henry v. Cisco Systems, Inc.*,  106 Fed.Appx. 235, 241, 2004 (5th Cir. 2004)

Plaintiffs contend that the 30(b)(6) deposition of George H. Sellers is "damning, binding testimony admitting that the contamination of the plaintiffs' property was not only continuing but *increasing*...." *R. 56.* As set out heretofore, the Court has found that plaintiffs' characterization of Sellers' testimony is at best overstated.  Sellers testimony, the Louisiana Cooperative Extension Service document and handwritten note from Charles Miller to Pliny Walet and the exhibits produced at the deposition of Stern establish that plaintiffs knew of the extent of the salt contamination before they executed the 1973 Release.

Even though plaintiffs sustained damages after the three year clean-up provision in the Release, this does not affect when prescription commences.   "'When a defendant's damage-causing act is completed, the existence of continuing damages to a plaintiff, even progressively worsening damages, does not present successive causes of action accruing because of a continuing tort.' *In re Med. Panel Review for the Claim of Moses*, 788 So.2d 1173, 1183 (La.2001). Instead, prescription commences

when the last tortious act occurs or the defendant's tortious conduct is abated. *Bustamento*, 607 So.2d at 542." *Henry v. Cisco Systems, Inc.,* 106 Fed.Appx. 235, 242 (5th Cir. 2004). Because Well No. 6 was plugged and abandoned on October 21, 1971 and plaintiffs entered into the 3 year Release with Chevron on September 12, 1973, after Chevron "restored the property to its original condition," Chevron's last tortious act occurred by September 12, 1973 and prescription began to run 3 years after the date of the Release.

### C.   The Cross Motions for Sanctions and Chevron's Motion to Strike

On October 19, 2007, plaintiffs filed a Motion for Sanctions against Chevron asserting that "Chevron is intent on circumventing the lawful discovery rules of this Court and in obstructing justice by concealing important evidence." *R. 69.* In turn, Chevron filed a Motion to Strike Plaintiffs' Motion for Sanctions and for Sanctions, as well as an opposition to plaintiffs' motion for sanctions. *R. 71; 78.* Chevron argues that plaintiffs' claims are disingenuous as plaintiffs were in possession of the documents they allege Chevron failed to produce, and that plaintiffs failed to produce documents which they admit they possessed and are responsive to Chevron's discovery requests.

Based on the record of this case as well as consideration of the pertinent documents cited by the parties and the legal and factual conclusions set out above, the Court finds it is not appropriate to award sanctions to either party, and therefore, the motions will be denied.  Chevron's motion to strike will be denied as moot.

### III. Conclusion

Based on the foregoing analysis, the Court finds: that plaintiffs' claims in this action have prescribed and Chevron's motion on the basis of prescription will be granted [Rec. Doc. 24] ; plaintiffs have failed to establish a cause of action against M&C and their motion to add M&C and remand will be denied as moot [Rec. Doc. 41]; plaintiffs' motion for sanctions [Rec. Doc. 69] and Chevron's motion to strike and for sanctions [Rec. Doc 71] will be denied as to the motions for sanctions and denied as moot as to the motion to strike.